# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 02-3365

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

FIDEL ROBELES-ORTEGA, also known as
FIDEL ROBLES-ORTEGA, also known as
FIDEL ORTIZ-ROLBOUES,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 CR 141— **Joan B. Gottschall,** *Judge.*

_____

ARGUED APRIL 7, 2003—DECIDED NOVEMBER 7, 2003

_____

Before BAUER, ROVNER, and WILLIAMS, *Circuit Judges.*

ROVNER, *Circuit Judge.* The sole issue in this case is whether the district court erred in denying the defendant's motion to suppress the evidence. The facts as recited by the district court are as follows.

On February 14, 2001, agents of the Drug Enforcement Agency (DEA) were monitoring a conversation between its confidential informant (CI), the defendant, and another person in an apartment, in which the CI was negotiating the purchase of seven kilos of cocaine. The CI was supposed to view the cocaine, then leave the apartment and convince

the defendant to follow him outside, at which time the DEA agents planned to arrest them. All did not proceed according to that plan. Instead, the defendant quoted a higher price than originally proffered, and the CI left the apartment alone. The CI entered the car and told the agent in the car (who the defendant was told was his nephew), that he had seen the cocaine. The agent and the CI then drove away from the scene.

The actions taken by the DEA agents at that point in time are inexplicable. Rather than obtaining a search warrant based on that information, within two minutes of the CI's departure the agents forcibly entered the apartment by breaking down the door. Approximately five agents entered the apartment with guns drawn, conducting a security sweep of the apartment while the occupants, including a four-year-old child, lay on the floor in the living room. During that sweep, the agents observed a gym bag on the floor in a bedroom which was later found to contain cocaine. The district court credited the agents' testimony that they did not search that bag at the time. Immediately after that sweep, the agents identified Azuzena Tabizon as the leaseholder, and they asked her to go to the kitchen with them. She complied, and they informed her that she was not a suspect, and requested that she sign a written consent for them to search the apartment. She did so, and the agents then searched the apartment and seized the cocaine.

The district court denied the motion to suppress the evidence, concluding that Tabizon's consent was sufficiently voluntary that it was not tainted by the agents' illegal entry. The sole issue on appeal is whether the district court erred in that determination.

The Fourth Amendment prohibition against unreasonable searches and seizures protects persons in their homes against unwarranted intrusions. The exclusionary rule

preventing the use of evidence obtained in violation of that amendment protects the Fourth Amendment guarantees by deterring lawless conduct by law enforcement officers and by " 'closing the doors of the federal courts to any use of evidence unconstitutionally obtained.' " *Brown v. Illinois*, 422 U.S. 590, 598 (1975); *Wong Sun v. United States*, 371 U.S. 471, 486 (1963). Therefore, in examining whether the exclusionary rule applies in this case, we are concerned not only with the privacy interests inherent in the Fourth Amendment, but also with considerations of deterrence and judicial integrity. *See Brown*, 422 U.S. at 598 and cases cited therein.

The Supreme Court has repeatedly set forth the principles to be applied where the issue is whether the evidence obtained after an illegal arrest or search should be excluded, as has this court. *See Brown*, 422 U.S. at 597 (1975). The Fourth Amendment exclusionary rule " 'extends as well to the indirect as the direct products of unconstitutional conduct' "; therefore, " '[i]n determining whether evidence is tainted by a prior illegality, we must determine whether the evidence was 'come at by exploitation of [the initial] illegality or instead by means *sufficiently distinguishable* to be purged of the primary taint.' " *United States v. Valencia*, 913 F.2d 378, 382 (7th Cir. 1990), *quoting Segura v. United States*, 468 U.S. 796, 804 (1984) and *Wong Sun*, 371 U.S. at 488. Where the search following the illegal entry is justified based on alleged consent, courts must determine whether that consent was voluntary, and in addition the court must determine whether the illegal entry tainted that consent. The Supreme Court has identified a number of factors relevant to that inquiry, including (1) the temporal proximity of the illegal entry and the consent, (2) the presence of intervening circumstances, and, particularly, (3) the purpose and flagrancy of the official misconduct. *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975). On appeal of the district court's denial of the motion to suppress, we review the dis-

trict court's legal conclusions *de novo* and its findings of fact for clear error. *United States v. Yang*, 286 F.3d 940, 944 (7th Cir. 2002).

In applying the above factors, the district court relied extensively on this court's decision in *United States v. Valencia*, 913 F.2d 378, 381 (7th Cir. 1990). In *Valencia*, officers were conducting surveillance on two individuals who were in the process of negotiating a narcotics transaction. One of the suspects indicated that he was going to speak with his "money man," and shortly thereafter he entered Valencia's apartment. *Id.* at 380. After he departed from that apartment, the officers observed a man, Valencia, leave the apartment. *Id.* They directed other officers to find and stop Valencia, and proceeded to the apartment. *Id.* They rang the apartment doorbell, and when a woman opened the door, the officers entered the apartment without her consent and secured it. *Id.* at 381. Meanwhile, other officers stopped Valencia and attempted to question him but were hampered by Valencia's limited English. *Id.* An officer arranged for a Spanish-speaking officer to meet them at Valencia's apartment, and drove Valencia home in Valencia's own car. *Id.* (The court held that this sequence of events was not an unlawful detention, and therefore that did not impact on the issue of whether the subsequent search was lawful. *Id.* at 382-83) Once Valencia returned to his apartment, he was read his *Miranda* rights in Spanish, and he answered questions, including volunteering that there was some marijuana in his kitchen, and $8,000-$10,000 and a .357 magnum revolver in his bedroom. *Id.* at 381. The officers found those items as indicated and asked him if he would consent to the search of his apartment, explaining that he did not have to do so. *Id.* He consented, and the officers discovered $316,000 and another handgun. *Id.*

The *Valencia* court first determined that he had voluntarily consented to the search. The court noted that he was

never threatened in any manner and that he remained calm throughout the process. *Id.* The court further noted that the most significant factor was that he was given his *Miranda* warnings and knew that he did not have to consent to the search, but did so anyway. *Id.* Therefore, the court upheld the district court's determination that his consent was voluntary. *Id.*

The *Valencia* court then turned to the issue of whether that consent was nevertheless tainted by the illegal entry. The court held that the consent was not tainted by that illegal entry. First, the court noted that the consent was obtained more than an hour after entry. *Id.* at 382. Second, the court state that the agents had not discovered any evidence in that illegal entry that they could use to coerce his consent, and that they therefore did not exploit the initial entry to obtain that consent. *Id.* Finally, they determined that the officers' mere presence did not coerce his consent, because the district court had held that his consent was voluntary. *Id.*

That situation is markedly different from the circumstance presented here. In *Valencia*, the defendant was not even at home when the illegal entry was made, and therefore the force and nature of the intrusion would not have tainted his consent. The consent was provided hours after the illegal entry, by a person who was not present at the time of the entry, and with no indication that the police had discovered any evidence during that illegal entry. In the present case, the agents literally broke down the door and entered with a strong show of force, brandishing their guns and having the occupants lay on the floor. Immediately after this incident, they removed Tabizon to the kitchen, and obtained her consent the search. The impact of the illegal entry on Tabizon's consent is simply dramatically different from the impact present in *Valencia*.

The district court acknowledged that only a few minutes had passed between the agents' initial entry and Tabizon's

consent, but held that "the evidence suggests that enough time had passed to lessen substantially the impact of the illegal entry on Tabizon before she consented." Op. at 6. That evidence was that they adjourned to another room, that she was told she was not a suspect, that they relinquished their weapons before joining her at the kitchen table, and that she was read and understood the consent form. According to the court, "[t]his testimony suggests that the time that passed after the initial entry, along with Tabizon's realization that she was not suspected of wrongdoing, vitiated the possibility that Tabizon was coerced by the initial entry." Op. at 7. That, however, is not the proper application of that factor. The question is whether the causal connection between the illegality and the consent was broken, and the government has the burden of persuasion on that issue. *Kaupp v. Texas*, 123 S. Ct. 1843, 1847 (2003); *United States v. Liss*, 103 F.3d 617, 623 (7th Cir. 1997) (Ripple, J. concurring)(quoting *Brown*, noting that the taint analysis applies whether the antecedent Fourth Amendment violation is an illegal seizure or an illegal search). The temporal proximity is relevant because a consent obtained immediately after an illegal entry is less likely to be unconnected to that entry. In this case, the court found that the consent was obtained within a few minutes of the illegal entry. It is difficult to imagine a shorter time frame between the unconstitutional action and consent. Therefore, as a matter of law this factor weighs against a determination that the causal connection was broken. The court's reliance of evidence of the voluntariness of the consent is misplaced in considering this factor. As *Valencia* held, the voluntariness of the consent is only the first step, and the next inquiry is whether the consent was tainted by the entry, in other words, whether it was the product of that illegal entry. In considering that issue, the temporal proximity in this case strongly favors the defendant and the district court erred as a matter of law in applying this factor.

Aside from its consideration of the temporal proximity, the court considered a couple of other factors in reaching its decision. First, the court considered whether the agents exploited the initial entry to induce consent. The district court did not credit the testimony of Tabizon that she was confronted with the contents of the gym bag, and instead held that nothing seen in the sweep was used to obtain her consent. We have no reason to question those findings and accept them as valid. The court then concluded that the agents did not use evidence obtained in the search to coerce her consent. Finally, the district court held that the agents' presence in the apartment did not have a coercive effect and that her consent was voluntary.

All of court's findings address whether agents coerced Tabizon's consent. That focus is misplaced, because the defendant does not bear the burden of demonstrating that the agents coerced the consent; instead, where a consent is obtained pursuant to an illegal entry, the burden of persuasion is on the government to demonstrate that the consent was not tainted by the illegal entry. *Kaupp*, 123 S. Ct. at 1847. The critical issue is whether the consent was obtained by means sufficiently distinguishable from that illegal and violent entry so as to be purged of the primary taint. *Valencia*, 913 F.2d 378, 382 (7th Cir. 1990), *quoting Segura*, 468 U.S. at 804 and *Wong Sun*, 371 U.S. at 488.

Therefore, we must focus on those factors alone and apply them to the facts presented here. Because the relevant facts are undisputed, the result of that test is clear as a matter of law. The first factor, the temporal proximity, has already been discussed, and the few minutes between the illegal entry and the "consent" can only weigh against a finding that the taint of that illegal action had dissipated. The second factor is the presence of intervening circumstances. The only "intervening circumstance" argued here is her agreement to sign the consent form. That is distinct from the types of circumstances that previously have been

considered sufficient. *See, e.g.*, *Wong Sun*, 371 U.S. at 491 (confession was made several days after illegal arrest and was preceded by arraignment and release from custody); *Rawlins v. Kentucky*, 448 U.S. 98, 108-09 (1980) (discovery of other incriminating evidence implicating the defendant and causing the defendant to confess spontaneously). There is no reason in this case to believe that her written consent was independent of the illegal entry. It was obtained almost immediately after that forcible entry into the home and subsequent show of force. As with confessions given after *Miranda* warnings, that consent alone does not necessarily purge the taint of the illegal action. *See Brown*, 422 U.S. at 603 (rejecting argument that Miranda warnings by themselves always purge the taint of an illegal arrest.) That is especially true where, as here, the other factors weigh strongly against that conclusion. Moreover, contrary to the government's argument, *United States v. Liss*, 103 F.3d 617 (7th Cir. 1997), does not hold that a consent is an independent intervening event that breaks the causal chain stemming from the illegal search. In *Liss*, the officers conducted an illegal search of a barn, and subsequently requested consent of the owner to the search of his house. The court held that the causal connection between the illegal barn search and the evidence found in the house was sufficiently attenuated because the barn search merely motivated the decision to seek the consent to search the house, but otherwise the search of that unrelated location had no role in the discovery of the evidence obtained pursuant to the non-custodial voluntary consent. *Id.* at 620-22. The *Liss* court explicitly contrasted the situation in which the illegal action and the subsequent consent search are of the same location, in which case the likelihood is greater that illegal action influenced the consent, and therefore the causal connection is stronger. *Id.* at 621. The government's attempt to turn all written consents into an "intervening circumstance" breaking the causal chain is inconsistent with that distinction in *Liss*, and with the Supreme Court's

rejection of a similar argument with respect to *Miranda* warnings in *Brown v. Illinois*, 422 U.S. 590 (1975).

We turn, then, to the third factor, which is the purpose and flagrancy of the official misconduct. In this case, the officers literally broke down the door, without exigent circumstances and without a warrant, and at least five agents rushed into the apartment with guns. The occupants of the apartment were apparently ordered to lie down on the floor while the agents entered all of the rooms. Similar to cases such as *Brown*, the manner of the illegal entry in this case "gives the appearance of having been calculated to cause surprise, fright, and confusion." *Brown*, 422 U.S. at 605. That invasion of a person's home is precisely the type of action the Fourth Amendment is most concerned with preventing, and therefore the interests in deterrence and in protecting the integrity of the judicial process are very high in this circumstance.

Because of the violent and sudden nature of the intrusion, the extremely short time period between the entry and the consent, and the absence of any other event that would have attenuated the impact of that illegal entry, we conclude as a matter of law that the evidence was not obtained by means "sufficiently distinguishable as to be purged of the primary taint." Nothing occurred in this instance that isolated the search and the discovery of the evidence from that illegal entry, or that could give us any confidence at all that "the causal connection between [the] illegal police conduct and the procurement of [the] evidence is 'so attenuated as to dissipate the taint' of the illegal action." *Liss*, 103 F.3d at 620, *quoting United States v. Fazio*, 9154 F.2d 950, 957 (7th Cir. 1990) (*quoting Segura v. United States*, 468 U.S. 796, 805 (1984)). Accordingly, the district court erred in suppressing the motion to exclude evidence.

That does not end the case, however, because the district court appears not to have reached alternate arguments

raised by the government below to justify the admission of that evidence. Accordingly, the decision of the district court denying the motion to suppress is VACATED and the case REMANDED for further proceedings consistent with this opinion.

BAUER, *Circuit Judge*, dissenting.  I respectfully dissent.

As the majority opinion points out, the essential facts are not in dispute so I will not repeat them except to note that the emphasis seems to be on the illegal entry—which is a given—and the outrage felt by this court. I think we agree, however, that the only issue is whether the consent was given voluntarily considering all the circumstances. The time lapse between one event: the entry, and the other: the consent, is *a* consideration and *was* considered by the district court. I cannot say her analysis or her conclusion were in error. Courts have held repeatedly that only seconds of reflections are necessary to form malice even in a murder case. I cannot see why so much more time is necessary for a person to give an informed consent to a search.

There was, it seems to me—and to the trial court— enough of a lapse between the entrance and the consent to call the consent informed. I am reluctant to substitute my judgment for hers, particularly where she accorded the parties three days of hearing, and came to a reasoned conclusion, and produced a thoughtful order that disposed of the issues involved.

I would affirm.

A true Copy:

   Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*