In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-3718

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LAZZERICK M. ALEXANDER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 07 CR 71—**John C. Shabaz**, *Judge.*

ARGUED SEPTEMBER 4, 2008—DECIDED JULY 21, 2009

Before MANION, WOOD, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Lazzerick M. Alexander was convicted, following his guilty plea, of possession of two firearms and ammunition by a convicted felon in violation of 18 U.S.C. § 922(g)(1). The district court sentenced him to 225 months' imprisonment. Alexander appeals from the district court's judgment, arguing that the court erred in denying his motion to suppress evidence. We affirm.

**I. The Searches**

In April 2007, Kathy Bastian, the manager of the Country Meadows apartment complex at 6804 Schroeder Road in Madison, Wisconsin, received an anonymous telephone call about a person staying with one of her tenants in the apartment complex. The caller, in notable detail, told Bastien that a man named Lazzerick Alexander, date of birth 10/24/80, was living with a Donelle or Vaniece Harris at 6804 Schroeder Road, Apt. 1. He described Alexander as an African American man of smaller build, approximately 5 feet 8 inches tall, 165 pounds, and he said that Alexander drove a white Buick Riviera with Wisconsin license plate number 909-LRS. The caller also told Bastien that Alexander was selling crack cocaine out of Apt. 1, charging $100 for eight-balls, $350 for half ounces, and $700 for one ounce. The caller said that Alexander cooked the crack in the apart-ment. The caller also told Bastien that he had heard that Alexander kept a gun hidden underneath the hood of the Buick Riviera. He advised her that Alexander was involved in a stabbing in Madison and currently was on probation or parole. Bastian called the cops and gave them the information she had received.

On April 16, 2007, Officer Daniel Nale of the Madison Police Department ("MPD") and other MPD officers were planning to arrest Alexander on the basis of an outstanding warrant for a parole violation. While planning for the arrest, Officer Nale heard over the city air channel that police dispatch was sending two officers to 6804 Schroeder Road to stand by as a vehicle—a white Buick

Riviera—was repossessed. Because the description of the vehicle matched the tipster's description of the vehicle Alexander drove, Nale asked to be added to the call.

Officer Nale contacted Bryan Bowman, the agent of Ultimate Repossessors Incorporated who was going to repossess the vehicle. Bowman told Officer Nale that he had information that the vehicle was registered in a female's name in Marshall, but a male was using the vehicle and staying at 6804 Schroeder Road Apt. 1. Officer Nale asked Bowman why he wanted the police to stand by, and Bowman advised that he heard from the registered owner of the vehicle (Jennifer Fjelstad) that the person who had the vehicle might react violently to its repossession. Officer Nale told Bowman about his concern that weapons may be in the car and asked him to wait and see if the police could find the vehicle first. Bowman agreed.

That evening, officers waited for Alexander at the Country Meadows parking lot. Officer Nale observed a white Buick Riviera with Wisconsin license plate 909-LRS turn into the parking lot. Nale pulled the vehicle over. He approached and observed Alexander sitting in the front passenger seat. Officers Dustin Clark and Matt Schroedl arrived and arrested Alexander based on the outstanding warrant for his arrest. Sergeant Kosovac arrived as well. Officer Nale placed the driver, identified as Antwan Richmond, in handcuffs.

Officer Nale testified at the suppression hearing that he said something to Alexander about the car and Alexander responded that it was not his car. Alexander claimed

that the car belonged to Richmond, or Richmond's girl-friend, "or whatever." Nale added that Alexander repeated three or four times that it wasn't his car. Similarly, Officer Schroedl testified that during the course of Alexander's arrest, Alexander stated that the vehicle did not belong to him, but belonged to Antwan. Officer Schroedl's report states that as he was walking Alexander back to his squad car, Alexander made reference to "my car," but when Schroedl asked whether he was referring to the Buick Riviera, Alexander stated, "No, that's Antwan's car." Subsequently, Schroedl placed Alexander in the back seat of his squad car. Nale's arrest report estimates that Alexander and Richmond were arrested at approximately 8:20 p.m.

Once Alexander and Richmond had been removed from the Riviera and arrested, Officer Nale called Bowman who was waiting at a nearby gas station and told him to come over. When Bowman and another individual arrived, Officer Nale identified Bowman based on a Wisconsin driver's license. Officer Nale asked Bowman if the Buick Riviera was the vehicle he was supposed to repossess, and Bowman answered that it appeared to be, but he would need to confirm the VIN to make sure. After Bowman confirmed the VIN with his paperwork, at approximately 8:28 p.m., Officer Nale turned the vehicle over to Bowman, indicating that the officers were done with it and had arrested two persons out of it. Bowman took possession of the Buick Riviera. Officer Nale then asked him to consent to a search the vehicle; Bowman gave his consent.

Officer Nale subsequently searched the vehicle. He opened the hood to the engine compartment and, at approximately, 8:33 p.m., found a brown cloth sack, which he pulled out of the engine compartment. Officer Nale could tell that the bag contained something heavy, like a handgun. He and Officer Schroedl opened the bag, discovering a handgun. Alexander was in Schroedl's squad car during the search of the Buick Riviera.

Shortly thereafter, Office Schroedl and two other officers, including Officer Jeffrey Felt and his canine partner, Gilden, went to Vaniece Harris's apartment at 6804 Schroeder Road, Apt. 1. Officer Felt had Gilden conduct a sniff of the doorway to Apt. 1. The dog didn't alert. Officer Schroedl knocked on the door, Harris answered and gave Schroedl and another officer permission to enter. The officers told Harris that Alexander had been arrested. Harris informed the officers that Alexander lived in the apartment. The officers reported that they had information that Alexander was cooking crack cocaine in the apartment and asked Harris if they could search the apartment. Harris declined to consent, indicating the officers would need a search warrant. With that, the officers exited the apartment.

The officers had the dog conduct a second sniff at Harris's apartment door. This time he sat—an alert for drugs. As a result, Officer Schroedl again knocked on the door. When Harris opened it, he and two other officers entered without asking for permission. Officer Schroedl testified that they wanted to secure the apartment to ensure that no evidence, especially drugs, was

destroyed. Officer Schroedl advised Harris that the dog had alerted to the presence of narcotics and, based on that and the information that Alexander was cooking crack cocaine in the apartment, they had probable cause and would apply for a search warrant. Harris asked how long that would take, and Officer Schroedl explained that it would take approximately two hours to draft a warrant application which would then have to be reviewed and approved by a judge. He advised Harris that they would stay until a search warrant was obtained. Officer Schroedl also informed her that she could consent to a search and it wouldn't take as much time. Harris said she would consent to a search of the apartment. When presented with the consent to search form, however, she said she didn't want to sign the form. Sergeant Linda Kosovac told Harris that they needed her to sign the form, and Harris responded that they would have to get a search warrant.

As a result, Sgt. Kosovac instructed Officer Schroedl to leave and begin drafting the search warrant application. He left to do so and the other officers remained in the apartment. Harris telephoned Alexander's mother to tell her what had been happening. Sgt. Kosovac advised Harris they would stay there until the search warrant came back and that she was free to move about. The officers maintained a normal conversational tone; they did not yell at or threaten Harris. Nor did they place her in handcuffs.

After again talking on the telephone with Alexander's mother, Harris told the officers that she would sign the

consent form and they could go ahead and search. Harris testified that she had changed her mind: It was late at night, she had to be at work the next day, and she was very tired. Harris signed the form. Thereafter, the officers searched the apartment and found a handgun and ammunition.

Alexander moved to suppress the evidence found during the vehicle and apartment searches. After a hearing, the magistrate judge recommended that the motion be denied. He determined that Alexander had no expectation of privacy in the vehicle because he had denied that it was his and therefore could not challenge the search. The magistrate judge also concluded that the searching officers reasonably relied on Bowman's apparent authority to consent to the search. And the magistrate judge reasoned that once the officers found the bag under the hood of the car, they had probable cause to believe it contained a gun and could, pursuant to the automobile exception to the warrant requirement, open the bag and seize the gun. The magistrate judge also found that the officers lawfully re-entered Harris's apartment and had probable cause to search the apartment. In addition, he concluded that the inevitable discovery doctrine applied. In the alternative, he concluded that Harris had consented voluntarily to the search of the apartment.

The district court adopted the magistrate judge's recommendations and denied Alexander's motion to suppress evidence. Alexander pled guilty, reserving his right to appeal the denial of his motion to suppress. The district

court accepted his plea, imposed sentence, and entered a judgment of conviction. A timely appeal followed.

## II. Analysis of Challenges to the Denial of the Motion to Suppress

Alexander appeals the district court's denial of his motion to suppress. He asserts that the court erred in refusing to suppress the evidence seized from the Buick Riviera because he had a possessory interest in the vehicle which he had not abandoned. He also claims that Bowman's consent to search was ineffective given the extensive police involvement in the repossession and that the police erroneously relied on Bowman's consent. Alexander next argues that the court erred in refusing to suppress the evidence obtained from Harris's apartment because neither probable cause to search nor exigent circumstances existed. Lastly, he claims that Harris's consent was not voluntarily given.

When reviewing the denial of a motion to suppress evidence obtained during a warrantless search, we review legal conclusions de novo and factual findings for clear error. *United States v. Sims*, 551 F.3d 640, 643 (7th Cir. 2008). Mixed questions of law and fact are reviewed de novo. *United States v. Fiasche*, 520 F.3d 694, 697 (7th Cir.), *cert. denied*, 129 S. Ct. 281 (2008). The essence of Alexander's dispute with the rulings on the motions to suppress is with the conclusions rather than the underlying facts. So our discussion will focus on the district court's application of the law to the facts.

**A. Search of the Vehicle**

Alexander first argues that the district court erred in refusing to suppress the evidence obtained from the search of the Buick Riviera. A defendant who objects to a search as violating his Fourth Amendment rights bears the burden of proving that he had a legitimate expectation of privacy in the area searched. *United States v. Yang*, 478 F.3d 832, 835 (7th Cir. 2007). A person cannot have a reasonable expectation of privacy in abandoned property, *United States v. Pitts*, 322 F.3d 449, 455-56 (7th Cir. 2003), unless the abandonment results from police misconduct, *United States v. McDonald*, 100 F.3d 1320, 1328 (7th Cir. 1996). "To demonstrate abandonment, the government must prove by a preponderance of the evidence that the defendant's voluntary words or actions would lead a reasonable person in the searching officer's position to believe that the defendant relinquished his property interests in the item to be searched." *Pitts*, 322 F.3d at 456 (citation omitted). The test is an objective one: We consider only "the external manifestations of the defendant's intent as judged by a reasonable person possessing the same knowledge available to the" searching officer. *Id.*

Alexander contends that the district court erroneously found that he had abandoned the Riviera because the government failed to establish that he denied ownership of the vehicle prior to the search. Though the district court did not make a specific finding as to when Alexander denied owning the vehicle, the record establishes that he began denying that the car was his prior to the search.

Officer Schroedl's report states that as he was walking Alexander back to his squad car, Alexander referred to the Buick Riviera, saying that it wasn't his and it was "Antwan's car." The record also establishes that Alexander repeatedly said that it wasn't his car and, more importantly, that Alexander already had been placed in the squad car by the time the search of the vehicle occurred. Thus, the record supports the finding that Alexander denied ownership of the vehicle prior to the search; it does not support a finding that his denials were made as a result of the search of the vehicle.[1]

Alexander submits that not every disclaimer of ownership signifies relinquishment of a legitimate expectation of privacy. *United States v. Ellis*, 499 F.3d 686 (7th Cir. 2007), on which he relies, is unhelpful to him. In that case, although Ellis denied living in the home when officers asked him to consent to a search of the home, he later asserted that he lived there and the government agreed. *Id.* at 688-89. Here, in contrast, Alexander was merely a passenger in the vehicle, the officers knew at the time of the search that the vehicle was titled in another person's name, and Alexander denied that the vehicle was his prior to the search.

Even assuming that Alexander had an ownership or possessory interest in the Buick Riviera, in deciding whether he abandoned that interest, we look to "the external manifestations of [his] intent as judged by a

---

[1] In any event, as discussed below, the search was lawful based on Bowman's apparent authority to consent.

reasonable person possessing the same knowledge available to the" searching officers. *Pitts*, 322 F.3d at 456. The officers knew that the Buick was titled in Feljstad's name and that Alexander had disclaimed that the vehicle was his. That is enough to establish abandonment despite the officers' belief that the Buick Riviera was Alexander's. Anyway, the officers had no knowledge at the time of the search that Alexander claimed to be the true owner of the Buick by virtue of making the payments on it, as Alexander later claimed in an affidavit filed with the district court. A reasonable person in the searching officers' position would believe that Alexander relinquished his property interests in the Riviera. Therefore, Alexander abandoned the vehicle and his Fourth Amendment rights were not violated by the vehicle search.

And, as we shall see, the search of the Buick Riviera was also lawful on another basis—Bowman's consent. Alexander first contends that Bowman's consent to search was ineffective based on the extensive police involvement in the repossession. In Alexander's view, the police did not merely assist in the repossession, but rather, repossessed the vehicle for Bowman, using his desire to repossess the Buick as a pretext to avoid the warrant requirement. The record establishes that Officer Nale had been planning to arrest Alexander before learning that Bowman intended to repossess the vehicle. And the officers stopped the Buick Riviera and arrested Alexander and Richmond before turning the vehicle over to Bowman. While the officers' stop and arrests made Bowman's job much easier and less risky, the two events—the stop and arrests on the one hand, and the

repossession on the other—were not one. Viewed in this way, the officers were not actively involved in the repossession.

Alexander also challenges the district court's conclusion that Bowman had apparent authority to consent to the search of the Buick. Apparent authority to consent to a search exists "when the facts available to an officer at the time of a search would allow a person of reasonable caution to believe that the consenting party had authority over the premises." *United States v. Ryerson*, 545 F.3d 483, 489 (7th Cir. 2008) (citations omitted). The court considers what the officers knew at the time they sought consent, not facts that came to light after the search began. *United States v. Groves*, 470 F.3d 311, 319 (7th Cir. 2006). An officer has "a duty to inquire further as to a third party's authority to consent to a search, if the surrounding circumstances make that person's authority questionable." *United States v. Goins*, 437 F.3d 644, 648 (7th Cir. 2006).

Alexander claims that the officers lacked sufficient facts to reasonably believe that Bowman had authority to consent. Bowman did not present any verification of his identity as an agent of Ultimate Repossessors, such as a business card or company identification, and the record does not reflect that any of the officers knew him from prior repossessions. Nor did Bowman actually share any paperwork, such as the order to repossess, with the officers.

However, other facts known to the officers at the time would permit them to reasonably believe that Bowman

had authority over the Buick Riviera. Officer Nale had heard that dispatch was sending officers to stand by with a repossessor while he tried to repossess a vehicle. Officer Nale added himself to the call and contacted the repossessor, inquiring why he wanted the police to stand by. Bowman told Nale that the registered owner had told Bowman that the person who had the car might react violently to its repossession. After Officer Nale stopped the Buick Riviera and arrested Alexander, he called Bowman who came to the scene within a minute or so. Officer Nale identified Bowman based on his state driver's license, thus confirming that he was the person Nale had contacted earlier regarding the repossession. Bowman told Nale that the Buick Riviera looked like the vehicle he was supposed to repossess, but he needed to check the VIN. According to Officer Nale, Bowman showed him his clipboard and Nale glanced at it. Bowman confirmed the VIN with his paperwork and indicated that the car was the one he was there to repossess. Officer Nale testified that he had assured himself that Bowman was who he claimed to be and that he had authority to consent to the search of the vehicle, which was based on the fact he was repossessing the vehicle.

It is not surprising that Bowman arrived without any keys to the Buick Riviera. One would not necessarily expect the repossessor to have keys to the vehicle to be repossessed; the persons who drove the vehicle would be more likely to have the keys. Nor is it surprising that Bowman arrived without a tow truck at hand. He did not know, after all, the exact location where the

vehicle would be found and repossessed. It would only make sense to first locate and repossess the vehicle and then call for a tow truck. A repossessor cruising a neighborhood in a tow truck might not be as successful at locating wanted vehicles as one who arrives in a less noticeable form of transportation. Besides, the repossessor may not know what type of tow truck was needed until the location and condition of the vehicle are known.

Alexander argues that the officers' reliance on Bowman's consent was unreasonable because the repossession violated state law. Wisconsin law authorizes a merchant to repossess collateral provided that the merchant does not commit a breach of the peace. Wis. Stat. Ann. § 425.206(2)(a). According to Alexander, the statute prohibits repossession when resistance by the debtor or a third party merely threatens a breach of the peace. For authority he relies on *Hollibush v. Ford Motor Credit Co.*, 508 N.W.2d 449 (Wis. Ct. App. 1993). But *Hollibush* does not stand for the proposition that the mere fear of resistance by the debtor is a breach of the peace. Instead, *Hollibush* held that the creditor's agent breached the peace by repossessing the debtor's vehicle when the debtor or her fiancé told the agent not to repossess the vehicle. *Id.* at 455. Similarly, the other case relied on by Alexander also involved repossession in the face of the debtor's objection, which was found to be a breach of the peace. *See First & Farmers Bank of Somerset, Inc. v. Henderson*, 763 S.W.2d 137, 140 (Ky. Ct. App. 1988). Here, neither Fjelstad, Alexander, nor, for that matter, Richmond, objected to the repossession. Besides, the concern here is whether the

officers could have reasonably believed that the repossessor had authority to give consent. Evaluation of the reasonableness of their belief in the context of the Fourth Amendment is not dependent on every nuance of Wisconsin repossession law. The facts known by these officers were sufficient to support a reasonable belief that Bowman had such authority.

The next challenge made by Alexander is that Bowman lacked authority to consent to the search of closed containers within the vehicle. We need not address whether the scope of Bowman's authority included closed containers, however. Once Officer Nale opened the hood and discovered the brown bag inside the engine compartment, together with the informant's tip that Alexander kept a gun hidden under the hood, the officers had probable cause to believe that the bag contained a gun, which was contraband when possessed by Alexander, a known convicted felon. *See United States v. Scott*, 516 F.3d 587, 589 (7th Cir. 2008) ("Probable cause to search exists 'where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found.'" (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996))). And, under the automobile exception to the warrant requirement, they were authorized to open the bag and seize the handgun. *United States v. Ross*, 456 U.S. 798, 820-22 (1982) (permissible scope of search includes containers and packages found inside vehicle); *United States v. Johnson*, 383 F.3d 538, 546 (7th Cir. 2004) (stating that scope of a permissible search extends to the trunk of the vehicle including any containers therein); *United States v. Young*,

38 F.3d 338, 340 (7th Cir. 1994) ("A search of an auto-mobile based on probable cause lawfully extends to all parts of the vehicle in which contraband or evidence could be concealed, including closed compartments and trunks.").

We conclude that the warrantless search of the Buick Riviera and the bag found in the engine compartment was reasonable under the Fourth Amendment. Accordingly, the district court correctly denied Alexander's motion to suppress the gun seized during that search.[2]

### B. Entry and Search of the Apartment

Alexander challenges the district court's refusal to suppress the handgun and ammunition obtained from the search of the apartment. He maintains that the officers' re-entry into the apartment was unlawful, that the officers lacked probable cause to search the apartment, and that Harris's consent to search was not voluntarily given.

Alexander argues that exigent circumstances did not justify the re-entry into the apartment and subsequent seizure of evidence. The presence (or not) of exigent circumstances in this case is beside the point. In *Segura v.*

---

[2] We need not rely on the search incident to arrest exception, so *Arizona v. Gant*, 129 S. Ct. 1710 (2009), has no direct bearing on this case—except that we note that the Supreme Court continues to recognize the automobile exception to the warrant requirement. *Id.* at 1721.

*United States*, 468 U.S. 796 (1984), the Supreme Court held that an illegal entry upon the premises did not require the suppression of evidence later discovered pursuant to a valid search warrant issued on the basis of information wholly unconnected to the illegal entry. *Id.* at 813-14. The illegality of the entry is irrelevant to the admissibility of evidence obtained through an independent source. *Id.* The Court also held that officers who have probable cause may enter and secure the premises from within to preserve the status quo while a search warrant is obtained without violating the Fourth Amendment's prohibition of unreasonable seizures. *Id.* at 810.

Thus, whether the officers' re-entry into Harris's apartment was illegal is irrelevant. None of the information which would support the issuance of a search warrant was based on anything the officers learned from their re-entry into the apartment. They did not conduct a search of the apartment immediately upon re-entering. Instead, they entered to secure the premises to prevent the destruction of evidence while they sought to obtain a search warrant. This they could lawfully do, provided they had probable cause.

So, we turn to that question. "Probable cause to search exists 'where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found.'" *Scott*, 516 F.3d at 589 (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). The probable cause determination asks whether "given the totality of the circumstances, there is a fair probability that contraband or

evidence of a crime will be found in a particular place." *Id.* (quotation omitted).

According to Alexander, the highly detailed tip provided to the police was corroborated only by illegally obtained evidence, namely, the handgun found in the Buick Riviera and, without that, the officers lacked probable cause to search the apartment. Police corroboration of an informant's tip is valuable in determining the reliability of the tip and, ultimately, in establishing probable cause. *United States v. Wiley*, 475 F.3d 908, 916 (7th Cir. 2007); *United States v. Olson*, 408 F.3d 366, 372 (7th Cir. 2005). Alexander is right that the discovery of the handgun corroborated the tip. But he is wrong to believe this poses a problem. As addressed above, the gun was not illegally obtained.

Alexander also challenges the district court's conclusion that the dog's alert provided probable cause to search. He disputes whether the dog was sufficiently reliable based on his failure to alert initially to the doorway. It may be that the dog's alert on the second try would be insufficient, by itself, to establish probable cause. Yet probable cause is based on the totality of the circumstances. Probable cause to search the apartment existed independent of the dog's positive alert. The dog's alert merely provided another circumstance supporting the reasonable belief that the apartment contained drugs. Because the officers had probable cause to search the apartment, they lawfully could enter the apartment to secure it and maintain the status quo while obtaining a search warrant.

Moreover, a warrant to search the apartment would have been issued. Thus, the search was lawful notwithstanding Harris's consent. Under the inevitable discovery doctrine, the exclusionary rule is inapplicable where the government establishes by a preponderance of the evidence "that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984); *see also United States v. Tejada*, 524 F.3d 809, 813 (7th Cir. 2008) (stating in the context of a warrantless search that the inevitable discovery doctrine applies where the government establishes "that a warrant would certainly . . . have been issued had it been applied for"). The government has met that burden here.

As we said, the officers had probable cause to search the apartment. In addition, they had begun the process of obtaining a search warrant. Sgt. Kosovac directed Officer Schroedl to return to the police station to draft a search warrant application and Schroedl already had left to do that very thing. A warrant surely would have been issued had he completed the process of applying for one. And there is no reason to believe that he wouldn't have done so in the absence of Harris's consent to search. Therefore, the handgun and ammunition were admissible under the inevitable discovery doctrine.

Furthermore, Harris did give her consent to search. Though Harris's consent is irrelevant given the inevitable discovery doctrine, we will consider whether her consent was voluntary as this would provide an independent basis for upholding the apartment search.

The voluntariness of a consent to search is a factual determination, which we review for clear error. *United States v. Johnson*, 495 F.3d 536, 541 (7th Cir.), *cert. denied*, 128 S. Ct. 725 (2007). The government bears the burden of proving voluntariness. *Id.* In determining the voluntariness, we consider the totality of the circumstances, including such factors as:

> (1) the person's age, intelligence, and education, (2) whether [s]he was advised of h[er] constitutional rights, (3) how long [s]he was detained before [s]he gave h[er] consent, (4) whether h[er] consent was immediate, or was prompted by repeated requests by the authorities, (5) whether any physical coercion was used, and (6) whether the individual was in police custody when [s]he gave h[er] consent.

*Id.* at 542 (quotation omitted).

Alexander identifies several factors to support his claim that Harris's consent was not voluntary: she was 22 years old; her only prior interaction with the police had been related to traffic violations; she did not consent immediately but only after the officers persisted; at least three officers were present; she believed the officers would tear the place apart if she refused to consent; they advised her that if she refused consent and any contraband was found, she would be arrested; and they represented that they would obtain a search warrant. As to these last two points, an officer's factually accurate statement that the police will take lawful investigative action in the absence of cooperation is not coercive conduct. *See United States v. Miller*, 450 F.3d 270, 272-73 (7th Cir. 2006),

*abrogated on other grounds by Kimbrough v. United States*, 552 U.S. 85 (2007). There is no reason to doubt that the officers would have obtained a search warrant had they applied for one, and they could have arrested Harris upon discovering contraband in her apartment.

Both the magistrate judge and district judge considered the relevant factors and determined that Harris's consent was voluntarily given. The findings, based on Harris's own testimony, that Harris "is intelligent, articulate, and strong-willed" and "refused to consent until she decided, on her own, that it was in her best interest" are not clearly erroneous. Harris chose to change her mind and voluntarily gave her consent to search. The district court did not err in finding that her consent was voluntary.

That doesn't end our inquiry, though, as Alexander claims that the officers' illegal entry into the apartment tainted Harris's consent. Even assuming that the officers' re-entry was illegal, suppression would not be required. Where "consent is obtained pursuant to an illegal entry, the burden of persuasion is on the government to demonstrate that the consent was not tainted by the illegal entry." *United States v. Robeles-Ortega*, 348 F.3d 679, 683 (7th Cir. 2003) (citation omitted). The government may make this showing by establishing that "the consent was obtained by means sufficiently distinguishable from that illegal . . . entry so as to be purged of the primary taint." *Id.* Factors we consider in determining whether an illegal entry tainted consent include: "(1) the temporal proximity of the illegal entry and the consent, (2) the presence of

intervening circumstances, and, particularly, (3) the purpose and flagrancy of the official misconduct." *Id.* at 681. The district court did not apply these factors because it believed that the re-entry was legal. Our application leads us to the conclusion that the re-entry did not taint Harris's consent.

The temporal proximity of the alleged illegal re-entry and Harris's consent is unclear, but the record reveals that the consent did not follow right on the heels of the officers' re-entry. There was enough time between the re-entry and Harris's consent for the following to occur: the officers explained the warrant application process to Harris and requested her consent, which was refused; Sgt. Kosovac retrieved a written consent form from her squad car and returned to the apartment to review it with Harris; Harris verbally consented but then refused to sign the form; Officer Schroedl left to prepare a warrant application; Harris phoned Alexander's mother to discuss the situation at which point Harris decided to consent to search; and Sgt. Kosovac reviewed the written consent form with Harris. These facts reflect not only the passage of time but also intervening circumstances—Harris's call to Alexander's mother and subsequent decision to execute the consent form. As for the third factor, the purpose of re-entry was to secure the premises and maintain the status quo. The officers did not search the apartment and did not discover any evidence to use to coerce Harris's consent. Nor is there any suggestion that they used force or violence to enter—they knocked on the door and, when Harris opened it, they entered without seeking her permission.

Alexander submits that the re-entry was calculated to surprise and confuse Harris, but the manner of the entry does not bear this claim out. Indeed, the re-entry was prompted by the dog's alert on the second try. Our consideration of the relevant factors leads to the conclusion that the re-entry did not taint Harris's consent.

For all of these reasons, we conclude that the district court properly refused to suppress the handgun and ammunition found in Harris's apartment.

### III.  Conclusion

We AFFIRM the district court's judgment.