In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-1608

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

DAVID R. CARTER,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 CR 149—**Joan B. Gottschall**, *Judge.*

ARGUED JUNE 4, 2009—DECIDED JULY 20, 2009

Before FLAUM, WOOD, and TINDER, *Circuit Judges*.

FLAUM, *Circuit Judge*. David R. Carter is charged with robbery of a Chicago Community Bank branch on the south side of Chicago in February 2008. The constable blundered while investigating his case, and the district court accordingly suppressed much of the evidence against him. The government now appeals, arguing that the district court erred by suppressing (1) a bank teller's out of court identification of Carter, (2) bait bills and other evidence taken from an apartment

where Carter was arrested, and (3) Carter's post-arrest statement to investigators.

For the following reasons, we reverse the district court's order suppressing the disputed evidence.

## I. Background

On February 20, 2008, someone robbed the Chicago Community Bank on the south side of the city by approaching a teller, reaching into his jacket as though he had a gun, demanding money, and making off with a little over $1,000. Unfortunately for the robber, he also took with him a number of "bait bills," or easily identifiable bills used to trace stolen money. Witnesses described the robber as being a white male in his late forties or early fifties, standing about 5'10" tall and weighing about 160 pounds, with facial stubble. Witnesses also said he was wearing a tan or gray jacket and a blue baseball cap with white lettering. He fled eastbound from the bank on foot.

After responding to the robbery, Chicago police officers sent out a flash message with a description of the robber and his clothing. Officers questioning potential witnesses near the bank also learned that the description of the bank robber matched that of a man who had walked into a food court on 35th Street the night before, demanded money, and asked employees, "How about I blow all your brains out?" The description of the robber also rang a bell for Chicago police officer Alfred Thome, who heard the flash message and believed the description

matched a man he had seen earlier in a domestic violence call in the same neighborhood. Thome was not assigned to the case, but decided to check out his hunch. At around 11:00 that morning, he went to the address of the earlier call, 937 W. 34th Place, to find the suspect.

There are three residences at 937 W. 34th Place; there is a single-family residence facing the street with a two-flat building sitting behind that. Thome first went to the rear building, where he had previously encountered his suspect, but found the way blocked by a large dog. So he went around to the front unit. There, he met Barbara Hunter, the girlfriend of the landlord's son. Thome asked Hunter about the residents of the upstairs rear unit. She told him that nobody was living in the unit at the time and that the landlord was in the process of kicking out the residents of that apartment. Hunter agreed to escort Thome to the apartment with a set of keys, and Thome radioed for back-up from other officers. Hunter gave Thome permission to go inside, and three or four other officers, responding to Thome's call for back-up, went inside once they arrived.

The apartment was apparently in some kind of disarray, although Thome did find some personal effects, including a Cook County Inmate ID Card for a "David Carter." Sure enough, the photo on the ID card matched the description of the bank robber. Thome gave the card to two other Chicago police officers and asked them to show it to the employees at the food court. The employees confirmed to those officers that the man in the ID photo looked like the man who had tried to rob them the night

before. (The same man had apparently come in to the food court that morning as well, which presumably made it much easier to confirm his identity.)

The search of the upstairs apartment caught the attention of Mark Alvarado, the landlord at the apartment on 34th Place, who lived in the lower rear unit and who came out to talk to Thome. Alvarado told Thome that the people in the upstairs unit had been "thrown out." Thome's search also attracted the attention of FBI Special Agent Sean Burke, who was investigating the bank robbery. Burke arrived at the apartment on 34th Place, and took the Cook County ID card from Thome. He also spoke with Alvarado, who said that Carter was receiving mail at the apartment and may have been staying there, although under the terms of the lease only Carter's girlfriend and her son were supposed to be living in the unit. Alvarado explained that eviction proceedings were ongoing and that nobody had paid rent in four months. At some point in their conversation, Alvarado also supplied Burke with a list he had created with the names of nine people who had received mail at the apartment; the list included David Carter (who was listed on the form as "David Carter – Sex Offender").

Burke left 34th Place around noon and went back to the police station. He used the CLEAR database, a compilation of Chicago Police Department files, to look up the criminal history for a "David Carter" associated with the 34th Place address. This history revealed a number of run-ins with law enforcement, some as

recently as a month before. The file also contained a photo of Carter (evidently a different photo from the ID card) that Burke used to create a six-person photo array. At around 1:00 p.m., Burke took the photo array to the bank teller, who identified Carter as the robber.

Chicago police officer Anthony Corral was one of a number of officers assigned to look for Carter that afternoon. Corral and his partner learned from a restaurant employee at 34th and Halsted that Carter was in the area from time to time; Corral and his partner then continued asking people in the neighborhood if they recognized Carter or had seen him recently. An individual living in the 3300 block of May Street not only recognized Carter but believed that he was staying at an apartment at 3326 South May Street. Later, that same person contacted Corral and told him that Carter was in the apartment at 3326 South May. Corral and his partner went to the apartment, knocked on the door, and received permission to enter from the person who answered. They found Carter inside, along with several bait bills from the Chicago Community Bank. Carter signed a *Miranda* waiver at the station and agreed to give a statement, in which he admitted robbing the Chicago Community Bank.

On March 11, 2008, a grand jury indicted Carter for one count of bank robbery. On May 28, 2008, Carter filed a motion to suppress much of the evidence against him, including the bank teller's identification from the photo array, a food court employee's identification of Carter from the night before and the morning of the

robbery, and his post-arrest statement. Carter argued that Thome had illegally searched his residence on 34th Place without a warrant or permission, and that the case against him was largely built out of that search, since the police only learned his identity from the ID card Thome took from the apartment. The district court initially granted the motion in part and denied it in part. After Carter filed a motion to reconsider and the district court held an evidentiary hearing, however, the district court ruled that much of the evidence was inadmissible because it was too closely tied to information gleaned from the illegal search. As the district court found,

> No doubt the officers desired to act quickly to arrest a suspected robber before he disappeared or committed another crime, and the officers seized upon the impermissible fruit and ran with it. No sufficiently distinguishable source of momentum altered the trajectory of the officers' activities. Given both the short period of time, the direct connection to the illegal search, and the clear purpose of the illegality, the attenuation theory does not protect: (1) the out of court identification by the bank teller; (2) evidence seized during Carter's arrest and ensuing search; or (3) Carter's post-arrest statement.

The government now appeals the adverse evidentiary ruling. Before the district court, the government argued that the evidence is admissible under the inevitable discovery exception to the exclusionary rule, and alternatively that at least some of the evidence should be allowed in because its discovery is attenuated from the

illegal search of Carter's apartment. The government does not appeal the district court's determination that Thome's search of Carter's apartment was illegal and concedes that the out of court identification of Carter by a food court employee based on the ID card seized from the apartment is inadmissible. They argue, however, that the remaining evidence is admissible because its discovery was attenuated from the illegal search, and that the district court was incorrect to conclude otherwise.

## II. Discussion

The government's argument focuses on the attenuation issue and they have not advanced an inevitable discovery argument. We review a district court's order rejecting an attenuation theory de novo. *United States v. Ienco*, 182 F.3d 517, 526 (7th Cir. 1999). We review the factual findings underlying that decision for clear error. *United States v. Parker*, 469 F.3d 1074, 1077 (7th Cir. 2006).

The exclusionary rule requires the suppression of evidence seized in violation of the Fourth Amendment. However, "the fact that a Fourth Amendment violation occurred—i.e., that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies . . . [T]he exclusionary rule is not an individual right, and applies only where it 'results in appreciable deterrence.'" *Herring v. United States*, 129 S. Ct. 695, 700 (2009) (quoting *United States v. Leon*, 468 U.S. 897, 909 (1984)).

The Supreme Court developed an exception to the exclusionary rule for cases where an arrest or search

involved a Fourth Amendment violation but the connection between the illegal conduct and the subsequent discovery of evidence "become[s] so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost." *Brown v. Illinois*, 422 U.S. 590, 609 (1975) (Powell, J., concurring). "[T]he Court has determined that the exclusionary rule should not apply when the causal connection between illegal police conduct and the procurement of evidence is 'so attenuated as to dissipate the taint' of the illegal action." *United States v. Fazio*, 914 F.2d 950, 957 (7th Cir. 1990) (internal citation omitted). Attenuation "mark[s] the point of diminishing returns of the deterrence principle inherent in the exclusionary rule." *Ienco*, 182 F.3d at 526. "It is critical that courts wrestling with 'fruit of the poisonous tree' issues keep that fundamental notion in mind, for when it is lost sight of the results can be most unfortunate." La Fave, *Search and Seizure*, § 11.4(a) at 235 (1996). When determining whether the causal chain between the illegal police action and the discovery of the disputed evidence is sufficiently attenuated to permit introduction of the evidence, a court examines three factors: "(1) the time elapsed between the illegality and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct." *Ienco*, 182 F.3d at 526. Bearing this standard of review in mind, we turn to the disputed evidence in this case.

## A. The teller's out of court identification

The first piece of evidence is the bank teller's identification of Carter as the robber based on a photo taken from the CLEAR database. The government first argues that the only information gleaned from the search of Carter's apartment was his name and a photo of him on an ID card; the photo simply confirmed that he matched the description of the robber and the name gave them the identity of a potential suspect. Burke's decision to run down Carter's criminal history and to assemble a photo array with a different photo was thus an intervening event that separated the teller's identification from the illegal search. They argue in addition that Burke could have conducted the database search without any of the information from Thome because Alvarado supplied him with Carter's name and the fact that he was a sex offender. Given his proximity to the scene of the robbery, Thome's suspicions about a man living at his address who resembled the robber, and his criminal history, the apartment search was attenuated from the CLEAR search that ultimately produced the photograph used in the teller's identification.

Carter counters that neither circumstance qualifies as an intervening event. First, he argues that the district court found that Alvarado talked to the police only after their illegal search of the apartment upstairs from him caught his attention. His encounter with the police was thus directly caused by the illegal search of Carter's home. Second, he argues that Burke's search of the CLEAR database was not an intervening circumstance

because Burke was only looking to confirm information that Thome discovered during the illegal search: Carter's identity and his criminal history. Burke did not search the database for any of the other names on Alvarado's list, and only looked for a David Carter residing at the address on 34th Place, and not any of the other David Carters in the city of Chicago.

The district court found that the teller's identification of Carter came about by exploitation of the evidence seized from his apartment because Burke knew, before ever running the database search, that Carter was a suspect in the bank robbery and that he should focus his search on Carter. The court was thus unimpressed with the fact that Burke could have learned the same information by running down the list of names from Alvarado (and may indeed have focused on Carter first, since the list revealed his criminal record).

The out of court identification is indeed the most questionable piece of evidence, but we conclude that is admissible under an attenuation theory. The district court's order suggests that the issue is "why [Burke] was focusing on Carter" and, in the end, Burke was focusing on Carter because Thome had taken his ID card during the search. Few cases, if any, applying the attenuation exception hold that evidence separately uncovered through completely lawful means is inadmissible because an illegal search first made a particular person a suspect in a

criminal investigation.[1] The Supreme Court has broadly rejected that kind of strict but-for causality in this context. *Hudson v. Michigan*, 547 U.S. 586, 591 (2006) ("But-for causality is only a necessary, not a sufficient cause for suppression."). Indeed, requiring suppression because an illegal search made Carter a target of the bank robbery investigation comes perilously close to Judge Friendly's famous hypothetical of "grant[ing] life-long immunity from investigation and prosecution simply because a violation of the Fourth Amendment first indicated to the police that a man was not the law-abiding citizen he purported to be . . ." *United States v. Friedland*, 441 F.2d 855, 861 (2d Cir. 1971).

---

[1] The district court's order cited three cases supporting its ruling on this issue. *United States v. Crews*, 445 U.S. 463 (1980) and *United States v. Foppe*, 993 F.2d 1444 (9th Cir. 1993) both involved out of court identifications using photographs taken during unlawful detentions; they are thus analogous to the out of court identifications from the food court employees using the unlawfully seized ID, but not to out of court identifications using a photograph that the police obtained through lawful means. The final case, *United States v. Edmons*, 432 F.2d 577 (2d Cir. 1970), concerned suspects arrested for not carrying selective service cards and then pressed into identification line-ups for unrelated investigations. Unlike those cases, the bank teller identified a photo of Carter that Burke obtained from a police database, not from the warrantless search. (And, again, the only connection between the search and ths discovery of the photo is Carter's name and address, which as discussed above is not a suppressible product of the illegal search under these circumstances.)

The Ninth Circuit has previously held that "it is *not* sufficient in demonstrating taint that . . . an illegal search uncovers the alleged perpetrator's identity, and therefore 'directs attention to a particular suspect.'" *United States v. Smith*, 155 F.3d 1051, 1061 (9th Cir. 1998) (citation omitted). The Eighth Circuit has reached a similar conclusion. *United States v. Watson*, 950 F.2d 505, 508 (8th Cir. 1991) ("[W]e conclude that where a law enforcement officer merely recommends investigation of a particular individual based on suspicions arising serendipitously from an illegal search, the causal connection is sufficiently attenuated so as to purge the later investigation of any taint from the original illegality.").[2] Setting aside the out of court identifications from the food court employees shown Carter's ID card (the suppression of those identifications was proper, and anyway the government does not appeal the issue), the search supplied investigators with Carter's name and (since the investigators had seen the illegally seized ID card) the knowledge that Carter matched the description of the bank robber. However, the fact that the search gave investigators a lead on a possible suspect does not make a subsequent identification of that suspect, given by a witness who had no knowledge of the illegal search and was not shown any of the evidence produced by it, subsequently inadmissible.

---

[2] Those decisions also accord with a decision from the Fifth Circuit holding that the convictions of two defendants were not illegal when their identity was first learned through a confession given without proper *Miranda* warnings. *Gissendanner v. Wainwright*, 482 F.2d 1293 (1973).

We also find it important that both Carter's name and address were provided to Burke by Mark Alvarado. That was all the information that Burke needed in order to run the CLEAR search that, ultimately, produced the photo used in the bank teller's identification. Carter argues that Alvarado's decision to supply the list of people who had received mail at the address was not a sufficient intervening event because Alvarado left his apartment to talk to the police in response to noise from the search upstairs, and because he only mentioned Carter's name after Burke asked about him. Neither of those arguments addresses the crucial issue, however. If a witness gave information to investigators after an illegal search the issue for purposes of the intervening factor inquiry is whether the witness voluntarily disclosed it, not whether the illegal search bore any causal relation-ship at all to the disclosure. In *United States v. Carsello*, 578 F.2d 199 (7th Cir. 1978), we held that evidence given to investigators by witnesses who were found, in part, because of records seized during an illegal search was nonetheless admissible. When the witnesses had voluntarily cooperated with the investigation and provided the police with tangible evidence, a court would not further the deterrent purpose of the exclusionary rule by suppressing that evidence. *Id.* at 203 (citing *United States v. Ceccolini*, 435 U.S. 268 (1978)).

We conclude that Alvarado voluntarily provided the information about Carter and the other occupants of the apartment to Burke. Alvarado was not a suspect in the robbery and was not in custody when the investigators questioned him. Moreover, he had at least some incentive

to cooperate with investigators, as he was in the process of evicting Carter and his girlfriend and because Carter was living in the apartment off-lease. In short, the circumstances suggest that Alvarado voluntarily cooperated with Burke's investigation, and that the information that he provided should not be discounted because of Thome's warrantless search. *See Ceccolini*, 435 U.S. at 277 (a court should examine "the time, place and manner of the initial questioning of the witness" in order to determine whether "any statements are truly the product of detached reflection and a desire to be cooperative on the part of the witness."). Alvarado's list, which provided Carter's name and address and some indication of his previous criminal record, was itself sufficient to produce the photograph from the CLEAR database used in the teller's out of court identification.

Finally, we conclude that neither the timing of the events nor the purpose and flagrancy of the search supports suppression in this case. While the government concedes that very little time separated Thome's search of the apartment on 34th Place from the teller's identification, "the time frame [is] only one factor to consider, and is never dispositive." *Ienco*, 182 F.3d at 526. We have previously held that a search was attenuated from illegal conduct even where only a few minutes passed between the conduct and the search. *See Parker*, 469 F.3d at 1078-79.

Nor do we conclude that the purpose and flagrancy of the violation supports suppression. The district court found that this factor weighed against the admissibility of

the evidence because "every activity was undertaken in an effort to develop the evidence against Carter. There was no purpose other than to confirm Carter's name and to confirm if Carter was the suspect in question." This way of phrasing the issue conflates the inquiry between flagrant and purposeful behavior, however. Courts have previously found that a Fourth Amendment violation was flagrant and purposeful where "(1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely uncon-stitutional but engaged in it nevertheless; and (2) the misconduct was investigatory in design and purpose and executed 'in the hope that something might turn up.'" *United States v. Simpson*, 439 F.3d 490, 496 (8th Cir. 2006) (quoting *Brown v. Illinois*, 422 U.S. 590, 605 (1975)). Where the police erred but the record does not support an infer-ence of bad faith, however, the violation was not flagrant. *See United States v. Green*, 111 F.3d 515, 523 (7th Cir. 1997); *Fazio*, 914 F.2d at 958 ("Because the primary purpose of the exclusionary rule is to discourage police miscon-duct, application of the rule does not serve this deterrent function when the police action, although erroneous, was not undertaken in an effort to benefit the police at the expense of the suspect's protected rights.").

   In this case, we find that the circumstances weigh against a finding that the Fourth Amendment violation was flagrant. Thome was acting on good police instincts in connecting the man he had previously seen at the apartment on 34th Place with the man who robbed the Chicago Community Bank. When he reached the apart-ment he did not enter straight away but instead spoke

with someone on the premises (Barbara Hunter) who told him that no one was living in the unit and that the landlord was in the process of kicking the previous tenants out. As the district court's first suppression order noted, Hunter also told Thome that Carter did not live in the apartment but only stayed there off and on with his girlfriend. Hunter also had a set of keys to the unit, which may have indicated to Thome that she had some authority to enter the unit. Finally, testimony indicated that the apartment was in a state of disarray when the officers entered, further suggesting that the tenants had already moved out. While in retrospect the search was constitutionally deficient, we cannot conclude that under these circumstances Thome knew or should have known that the apartment was still occupied and that the search was likely to be unconstitutional. Accordingly, this case does not involve the sort of flagrant and purposeful misconduct that merits application of the exclusionary rule to evidence unearthed subsequent to the warrantless search.

## B.  Evidence seized during Carter's arrest

The government next argues that the district court erroneously suppressed evidence seized from the May Street apartment when Carter was arrested, in particular the bait bills tying Carter to the robbery. As an initial matter, Carter argues that the government has not properly presented this issue because they have not demonstrated that "Individual B," the anonymous person who answered the door at the apartment

and gave the officers permission to enter, had actual or apparent authority to authorize a search. The history of this issue is a little complicated: The government argued below that the search was a valid consent search, authorized by Individual B, who was a guest of the person leasing the apartment, and the lessee, who returned home after being contacted by the police and also consented to a search. If true, this would validate the warrantless search. At any rate, this argument is no help to Carter since he has never tried to establish a Fourth Amendment interest in the May Street apartment where he was arrested. His larger Fourth Amendment argument depends on the apartment at 34th Place being his residence, since that is where the warrantless search took place. His connection to the May Street apartment is less clear, but he would need to advance some connection with the place before he would have standing to assert Fourth Amendment rights on behalf of the owner. Without that, he cannot assert someone else's protected privacy interest. *United States v. Mendoza*, 438 F.3d 792, 795 (7th Cir. 2006).

The district court excluded the bait bills because their admissibility "depends on the admissibility of the bank teller identification, or something else that would provide an intervening basis for the CPD's and FBI's interest in Carter as a suspect." But the court found that absent the illegal search, there was no basis for suspecting Carter. The government argues that even if we rule that the teller's identification did not provide the police with probable cause to arrest Carter, Individual B's consent to search was a sufficient intervening event

to break the causal chain between the illegal search and the search of the May Street apartment.

This circuit's precedents, most importantly *United States v. Liss*, 103 F.3d 617 (7th Cir. 1997), support the government's contention that the valid consent search of the apartment on May Street makes the bait bills and other evidence admissible, regardless of the reason that the police were looking for Carter. The defendant in *Liss* was charged with trafficking crystal methamphetamine after the police discovered drugs during a consent search of his home. *Id.* at 619-20. He argued that the results of the consent search should have been suppressed because the police only requested consent to search his home after discovering marijuana plants during a prior consensual search of his barn that, he argued, went beyond the scope of his consent. *Id.* at 620. Thus, he claimed that without the first illegal search there would have been no reason to suspect him of wrongdoing and no reason to want to search his home. We held that Liss' consent to search was a sufficient intervening event to break the causal chain between any illegal search and the subsequent discovery of incriminating evidence in his home. *Id.* at 621.

We reasoned in *Liss* is that the police do not need a good reason to request permission to search someone's home. *Id.* (citing *Florida v. Bostick*, 501 U.S. 429, 434-35 (1991)). Their motivation is essentially irrelevant because the person asked can always refuse to grant consent and stop

the search.[3] "The fact that an officer had actual suspicion, however obtained, cannot render invalid a consent for which the officer did not need any suspicion at all to request." *Id.*

In part this issue is settled by the resolution of the earlier issue, since the information Burke gleaned from the CLEAR database gave the police probable cause for seeking Carter's arrest. Even without that evidence, however, our holding in *Liss* requires us to conclude the bait bills taken from the apartment are admissible.

## C. Carter's confession

The government finally seeks admission of Carter's statement, made after the police arrested him at the apartment on May Street. There is no question that

---

[3] *Liss* drew a particularly strong concurrence, which argued that the Supreme Court has never said that consent, or any other factor, is per se an intervening event severing an illegal search from a subsequent discovery of evidence. *Id.* at 622-23 (Ripple, J., concurring). We subsequently explained in *United States v. Robeles-Ortega*, 348 F.3d 679 (7th Cir. 2003), that *Liss* is not a per se rule validating every consent search following a Fourth Amendment violation, and in *Robeles-Ortega* we held that it did not apply when the consent was given at the site of the illegal entry. *Id.* at 684. In the present case, however, consent was given by a person unaware of the earlier warrantless entry, at a different location, and with different police personnel involved. The holding of *Liss* would squarely govern these facts.

Carter made the statement voluntarily and after receiving proper *Miranda* warnings. The district court suppressed the confession, however, because Carter's arrest was dependent upon the validity of the bank teller's identification; because that identification was the fruit of the poisonous tree, there was no probable cause to justify Carter's arrest.

Whether the district court's suppression decision was appropriate thus depends upon whether the bank teller's statement was admissible. As we have already concluded that the identification is admissible, it would provide probable cause for Carter's arrest and makes his subsequent statement admissible. Even apart from the teller's identification, however, Carter was found in the May Street apartment with bait bills from the robbery, and he matched the general description of the robber given in the police department's flash message, both facts supporting probable cause for his arrest. Consequently, the statement is admissible.[4]

---

[4] The record does not contain any evidence indicating that Carter was shown the Cook County ID card or asked about it, and so we have no reason to conclude that the warrantless search of his apartment influenced his decision to make a statement. The district court also found that "[t]here is no allegation that Carter was treated improperly or otherwise coerced after being taken into custody, but there is also no evidence of any intervening event that might have prompted Carter to confess voluntarily." The district court's decision to suppress the statement was based on *Taylor v. Alabama*, 457 U.S.

(continued...)

### III.  Conclusion

For the foregoing reasons, we REVERSE the district court's suppression order and remand for proceedings consistent with this opinion.

---

[4]  (...continued)
687 (1982), and *United States v. Reed*, 349 F.3d 457 (7th Cir. 2003), both cases involving a confession given by a suspect arrested without probable cause. *Taylor*, 457 U.S. at 690-91; *Reed*, 349 U.S. at 463. As we have concluded that the arrest in this case was supported by probable cause, we have no reason to inquire whether, under *Brown v. Illinois*, 422 U.S. 590 (1975), there were sufficient intervening events to separate the confession from an illegal arrest.

---