In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-2001

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DAVID CONRAD,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:05-cr-00931-1—**Amy J. St. Eve**, *Judge.*

ARGUED OCTOBER 21, 2011— DECIDED MARCH 14, 2012

Before BAUER and TINDER, *Circuit Judges*, and MAGNUS-STINSON, *District Judge.*[*]

MAGNUS-STINSON, *District Judge.* If ordered, suppression of unconstitutionally obtained evidence can permit "[t]he criminal . . . to go free because the constable has blundered." *People v. Defore*, 150 N.E. 585, 587 (N.Y. 1926)

---

[*] The Honorable Jane E. Magnus-Stinson, District Judge for the United States District Court for the Southern District of Indiana, is sitting by designation.

(Cardozo, J.). Given a blunder that the Government does not dispute here, Defendant David Conrad argues that the district court should have suppressed all the evidence of child pornography that was recovered following an illegal entry into his father's home.[1] As we explain below, however, the district court correctly denied exclusion of evidence obtained from Mr. Conrad's own home—an hour's drive away from the home that had been illegally entered and which Mr. Conrad authorized the Government to search. That evidence was sufficiently attenuated from the original illegal entry so as to have been purged of the unconstitutional taint. With that evidence, he was convicted and, despite his arguments to the contrary, correctly sentenced in accordance with the Sentencing Guidelines in effect at the time of his conviction, rather than at the time of his offenses.

## I.

### Background

Before granting in part and denying in part Mr. Conrad's motion to suppress evidence, the district court held

---

[1] The Government advises that while it has chosen not to challenge the district court's finding that a constitutional violation occurred, it does not mean to concede that we would, if asked, ultimately agree that a violation occurred. For the purposes of this appeal, we will assume without deciding that the district court correctly found a constitutional violation.

an evidentiary hearing. *See United States v. Conrad*, 578 F. Supp. 2d 1016 (N.D. Ill. 2008). Because the parties disavow any challenge to the accuracy of those factual findings, the district court's findings presented below will govern on appeal.

## A. The Geneva Home

While the FBI was executing a search warrant for child pornography at a business owned by Mr. Conrad's father, federal and state law enforcement were staked outside the father's house, in Geneva, Illinois (the "Geneva Home"), looking for Mr. Conrad. For simplicity, we will refer to all law enforcement officials as "agents." Despite having received information from the father, who was away on vacation at the time, that Mr. Conrad was likely at the father's home and despite the presence of Mr. Conrad's car in the driveway, periodic knocks on the door went unanswered.

Eventually, without either a warrant or permission from Mr. Conrad's father and with the intent to further their investigation, agents went around the back of the Geneva Home. After knocking on the patio door on the lower level, they climbed a set of stairs and entered onto the deck that abutted the main level of the home. By either standing on or leaning across the deck's elevated railing, they peered into a bay window and saw Mr. Conrad asleep on the couch, with a pill bottle nearby. An FBI agent telephoned Mr. Conrad's father and told the father, incorrectly, that the pill bottle was located on a coffee table next to Mr. Conrad, when it was

actually in the kitchen. The agent also said that Mr. Conrad was lying still on the couch and that the agents were concerned about his health. The district court accepted that the concerns were "credibl[e]," though the concerns were not sufficient to give rise to legal "exigency" under the circumstances. *Conrad*, 578 F. Supp. 2d at 1039. In any event, after hearing that information, Mr. Conrad's father told the agents the location of the spare key and authorized them to enter the Geneva Home to check on Mr. Conrad.

Upon entering the Geneva Home, the agents discovered Mr. Conrad in good health; he had simply been asleep on the couch after having taken a prescription narcotic. Once Mr. Conrad had been roused from his sleep, the agents began questioning him about child pornography. He admitted to having child pornography on a laptop in his car, which he voluntarily provided to them. He also "volunteered" that he had additional evidence of child pornography in his apartment in Chicago (the "Chicago Apartment"), *Conrad*, 578 F. Supp. 2d at 1037. He willingly agreed to provide it to them, even though the agents told him that he was not in custody and that he did not have to take them to the Chicago Apartment.

## B.  The Drive to the Chicago Apartment

Approximately fifteen minutes after having first entered the Geneva Home, and without having searched it, the agents left the Geneva Home for the Chicago Apartment. Mr. Conrad rode with two agents, sitting in the backseat, uncuffed. During the approxi-

mately one-hour drive to the Chicago Apartment, Mr. Conrad smoked a cigarette and had free use of his cell phone, which he used to call his father. His father told him not to talk to the agents.[2] Mr. Conrad replied to his father: "It's no problem."

## C. The Chicago Apartment

The agents and Mr. Conrad arrived at the Chicago Apartment approximately two hours after the agents had stepped foot onto the curtilage of the Geneva Home without permission. After the agents and Mr. Conrad entered the Chicago Apartment, the agents read Mr. Conrad his *Miranda* rights, even though he was not in custody. He fed his cat, cleaned the litter box, and showed off some of his equipment for mixing music. About twenty minutes later, once the agents were ready to begin questioning him, Mr. Conrad signed an advice-of-rights form.

Despite Mr. Conrad's initial claim to the contrary, the district court found that Mr. Conrad never requested an attorney during his questioning, knowingly and voluntarily waiving his right to counsel and to remain silent.

---

[2] Because Mr. Conrad's opening brief stipulates that he "has not attempted to contest any of the underlying findings that gave rise to the district court's ruling," [Appellant Opening Br. at 12], we do not address the argument he raised in a post-hearing letter that the district court erroneously determined the contents of the call.

He admitted that he had operated a file server for child pornography, that he had child pornography on his computer, and that he had transferred child pornography from his laptop onto an external hard drive. He also confirmed additional incriminating information that the agents had developed during their investigation.

Mr. Conrad signed two other consent forms, after having been advised of his right to refuse to permit the search. In one, he gave written consent for the agents to search his apartment. In another, he gave specific written consent for the agents to search two laptops and an external hard drive, and gave oral consent to search another computer. The agents took some of those items with them when they left. They left Mr. Conrad behind; they did not arrest him that day.

* * *

After finding the facts set forth above, the district court held that the agents' warrantless entry onto the back deck violated Mr. Conrad's rights under Fourth Amendment, given that he had a reasonable expectation of privacy in his father's home, including the home's curtilage. As a remedy, the district court suppressed all evidence and statements obtained at the Geneva Home and from the car ride to the Chicago Apartment. It did not, however, suppress the evidence and statements that the agents obtained at the Chicago Apartment, finding that they were too attenuated from the constitutional violation to merit suppression.

A jury ultimately convicted Mr. Conrad of eight counts relating to child pornography. After considering the Sentencing Guidelines in effect on the date of sentencing, the district court sentenced Mr. Conrad to 198 months' imprisonment, rather than the guideline range of 360 months to life.

## II.

## Discussion

Mr. Conrad raises two issues on appeal. In the first, he argues that the district court erred when it refused to suppress the evidence and statements obtained in the Chicago Apartment. Second, he asks us to overrule our decision in *United States v. Demaree*, 459 F.3d 791 (7th Cir. 2006), by holding that the Sentencing Guidelines in effect at the time of his offenses, rather than at the time of his conviction, should apply.

### A. The Motion to Suppress

Although Mr. Conrad raised other potential constitutional violations below in his quest for exclusion of the evidence from the Chicago Apartment, he has abandoned the others in favor of the only violation that the district court found: the violation of the Fourth Amendment with respect to the curtilage of the Geneva Home. He argues that the district court erred in applying the attenuation exception to the evidence from the Chicago Apartment; he wants that evidence excluded as fruit of the poisonous tree, too.

We review the district court's application of the law to the uncontested facts *de novo*. *United States v. Ienco*, 182 F.3d 517, 526 (7th Cir. 1999) (citation omitted).

The Supreme Court has long recognized the need to exclude evidence obtained in violation of the Constitution's protections. *E.g.*, *Weeks v. United States*, 232 U.S. 383, 398 (1914). Indeed, unless one of various exceptions applies, exclusion will run not only to the unconstitutionally obtained evidence, but also to the fruits of that evidence—the so-called fruit of the poisonous tree. *See, e.g.*, *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920) ("The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all.") (Holmes, J.). The exclusionary rule thus seeks to discourage official misconduct by removing the incentive to obtain evidence in violation of the Constitution. *United States v. Calandra*, 414 U.S. 338, 348 (1974) ("[T]he rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." (footnote omitted)). Where exclusion will not "efficaciously" promote those "remedial objectives," no exclusion will occur. *Id.*

"The Supreme Court developed an exception to the exclusionary rule for cases where an arrest or search involved a Fourth Amendment violation but the connection between the illegal conduct and the subsequent discovery of evidence 'become[s] so attenuated that

the deterrent effect of the exclusionary rule no longer justifies its cost.'" *United States v. Carter*, 573 F.3d 418, 422 (7th Cir. 2009) (quoting *Brown v. Illinois*, 422 U.S. 590, 609 (1975) (Powell, J., concurring)) (alteration in original). In other words, the attenuation inquiry determines the point at which the government began obtaining evidence "by means sufficiently distinguishable to be purged of the primary taint." *Brown*, 422 U.S. at 599 (quotation omitted). The Government bears the burden of identifying that point, *id.* at 604, which requires the balancing of three factors: "(1) the time elapsed between the illegality and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct," *Ienco*, 182 F.3d at 526 (citations omitted).[3]

We will examine the three relevant factors in turn and then collectively, to determine whether the Government met its burden to show attenuation, as the district court found. In conducting that analysis, we will necessarily hew to the unique facts that the district court found, which are uncontested on appeal.

---

[3] When the evidence takes the form of a confession or other incriminating statement, voluntariness becomes a threshold issue of its admissibility. *See Brown*, 422 U.S. at 604 (citation omitted). Because Mr. Conrad does not challenge the district court's finding of the voluntariness of his statements to law enforcement, we need not revisit that threshold finding.

*1.  The Lapse of Time*

As for the first factor, the lapse of time, "there is no 'bright-line' test," *United States v. Reed*, 349 F.3d 457, 463 (7th Cir. 2003) (citations omitted), which is unsurprising given the fact-intensive nature of the attenuation inquiry. The district court found here that two hours elapsed between the curtilage violation and the collection of evidence in the Chicago Apartment. Depending on all the attendant circumstances, two hours may, or may not, be sufficient to purge the taint of a constitutional violation from later-collected evidence. *Compare, e.g., Taylor v. Alabama*, 457 U.S. 687, 691 (1982) (six hours insufficient); *Brown*, 422 U.S. at 604 (two hours insufficient as to original statement and ten hours insufficient to follow-up statement); *Ienco*, 182 F.3d at 526 (four hours insufficient); *with Rawlings v. Kentucky*, 448 U.S. 98, 107-08 (1980) (forty-five minutes sufficient); *United States v. Parker*, 469 F.3d 1074, 1078 (7th Cir. 2006) ("matter of minutes" sufficient).

On balance, we agree with the district court that this first factor weighs more in favor of attenuation than suppression. First, in terms of quantity, two hours from the violation of the curtilage to the collection of the evidence at issue is not insubstantial. We note in particular that Mr. Conrad's consent for law enforcement to enter and search the Chicago Apartment, and to question him, came after an hour's car ride. Second, in terms of quality, the car ride afforded Mr. Conrad the opportunity to reflect upon his circumstances, with the help of a cigarette and counsel from his father. At no point during the episode—according to the uncontested

findings below—was he ever in the custody of law en-
forcement for the purposes of the Fifth Amendment or
otherwise subject to a seizure within the meaning of
the Fourth Amendment. *Conrad*, 578 F. Supp. 2d at 1040-41.
In other words, although in law enforcement's presence,
"a reasonable person in the defendant's position would
have believed that he was free to leave" at any time.
*United States v. Snodgrass*, 635 F.3d 324, 327 (7th Cir. 2011)
(citation omitted) (Fifth Amendment). And "his freedom
of movement" was never "restrained" through "means of
physical force or a show of authority." *United States v.
Mendenhall*, 446 U.S. 544, 553 (1980) (Fourth Amendment
"seizure"). That situational context helps the passage
of time attenuate the underlying violation here. *See
Rawlings*, 448 U.S. at 107-08 (explaining that "the precise
conditions" of the detention—characterized by its "conge-
nial atmosphere"—made up for the otherwise quantita-
tively "short" passage of time, thus permitting the time
factor to weigh in favor of attenuation).

In his attempt to shorten the period under considera-
tion, Mr. Conrad incorrectly asks us to focus only on the
time between the agents' entry into the Geneva Home
and his decision to agree to take them to his Chicago
Apartment—in other words, fifteen minutes. While that
decision may have been a "but for" cause of his repeated
consents for the agents to search his Chicago Apart-
ment, we must not conflate the identification of the vio-
lation—here, the agent's improper entry onto the
curtilage at the Geneva Home—with the scope of the
remedy for that violation. "But for" causation is not
enough. *Hudson v. Michigan*, 547 U.S. 586, 592 (2006)

("[E]xclusion may not be premised on the mere fact that a constitutional violation was a 'but-for' cause of obtaining evidence. Our cases show that but-for causality is only a necessary, not a sufficient, condition for suppression.").

The two-hour period between the underlying violation and the consents in the Chicago Apartment is the appropriate unit of analysis. Given the nature of that period, this first factor tips in favor of attenuation.


### 2. Any Intervening Circumstances

The second factor in the balancing looks to see whether any intervening circumstances have occurred that might "sever the causal connection between [the violation] and the discovery of the evidence." *Reed*, 349 F.3d at 464. Again, the highly fact-intensive nature of the attenuation inquiry precludes sweeping generalizations about the circumstances that will be relevant for any particular case. Some cases finding this factor present have focused on the presence of "a non-custodial voluntary consent . . . as an independent intervening event," *United States v. Liss*, 103 F.3d 617, 621-22 (7th Cir. 1997), so long as that consent was neither obtained "immediately after an illegal entry," *United States v. Robeles-Ortega*, 348 F.3d 679, 683 (7th Cir. 2003), nor obtained following an "illegal stop[], detention[] or arrest[]," *United States v. Jerez*, 108 F.3d 684, 695 & n.13 (7th Cir. 1997) (collecting cases). Further, *Miranda* warnings, though never alone sufficient to establish attenuation given the differing purposes of the Fourth

and Fifth Amendments, *Taylor*, 457 U.S. at 690, can none-
theless be a relevant consideration, *see Reed*, 349 F.3d at 463
(describing voluntariness of confession as "important,"
though not so powerful as to overcome other consider-
ations on the facts presented). In other cases, the fact
that the evidence was obtained at a location away from
the site of the original violation became important.
*See, e.g.*, *New York v. Harris*, 495 U.S. 14, 20 (1990)
("[S]uppressing the statement taken outside the house
would not serve the purpose of the rule that made Harris'
in-house arrest illegal. The warrant requirement for an
arrest in the home is imposed to protect the home, and
anything incriminating the police gathered from
arresting Harris in his home, rather than elsewhere, has
been excluded. . . ."); *United States v. Fazio*, 914 F.2d 950,
958 & n.12 (7th Cir. 1990) (collecting cases). In still other
cases, courts have relied upon the defendant's ability
to "contact counsel or friends about [the defendant's]
predicament." *United States v. Patino*, 862 F.2d 128, 133
(7th Cir. 1998).

Consistent with existing precedent, the district
court identified intervening circumstances that
favored attenuation: Mr. Conrad's repeated consents to
search and his waiver of *Miranda* rights (which law en-
forcement was not even required to give because he
was not in custody), about two hours after the under-
lying constitutional violation and in a completely
different location. As for the different location, we
note that in contrast to cases where no attenuation
was found after the defendant was taken, for example, to
a police station, *e.g.*, *Taylor*, 457 U.S. 687, here Mr. Conrad

volunteered to go from his family home, a location where, according to the unchallenged findings of the district court, he "was undoubtedly comfortable," *Conrad*, 578 F. Supp. 2d at 1037, to a location that was as yet unknown to the agents, the Chicago Apartment. He was likely as or more comfortable there, and thus in a better position to decide whether to stand on his constitutional rights there. Furthermore, because the Chicago Apartment was independently protected under the Fourth Amendment, extending the scope of the exclusion would have little additional deterrent effect. *Cf. Harris*, 495 U.S. at 20 ("Even though we decline to suppress statements made outside the home following a *Payton* violation, the principal incentive to obey *Payton* still obtains: the police know that a warrantless entry will lead to the suppression of any evidence found, or statements taken, inside the home. If we did suppress statements like Harris', moreover, the incremental deterrent value would be minimal.").

Although the district court did not explicitly rely on it for this second factor, we also attach particular significance to another, rather unusual, circumstance. Mr. Conrad not only could use his cell phone to obtain advice about his predicament, but he actually did—and was, as the district court found, specifically told by his father "not to talk to the officers." *Conrad*, 578 F. Supp. 2d at 1025. While he suggests that his decision to ignore that advice was in recognition that he had already confessed to so much that he had no choice but to continue, the district court found, and he does not contest, that his statements were voluntary. *Id.* at 1036-37. The volun-

tariness of his statements—made despite superfluous *Miranda* warnings, a specific warning from his father, and after an hour to think in the car and twenty minutes to think while tending to his cats and showing off music equipment—help establish that his conduct at the Chicago Apartment was "sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Wong Sun v. United States*, 371 U.S. 471, 486 (1963) (footnote omitted).

Secure within the sanctity of his own home—one different and far away from the one that had had its curtilage violated—Mr. Conrad clearly wanted to speak rather than insisting upon his rights, repeatedly explained, to send law enforcement away. We find that this second factor also weighs in favor of attenuation.

### 3. The Purpose and Flagrancy of the Underlying Violation

The final factor that informs the attenuation analysis—that is, "the purpose and flagrancy of the official misconduct—is considered the most important because it is tied directly to the rationale underlying the exclusionary rule, deterrence of police misconduct." *Reed*, 349 F.3d at 464-65 (citations omitted). This factor considers both the conduct before and after the constitutional violation. *See id*. "Bad faith" cuts against attenuation. *Carter*, 573 F.3d at 425-26 (citation omitted). So do actions that were otherwise "coercive or calculated to cause surprise, fright or confusion" and "actions . . . undertaken in an effort to advance the investigation or to embark on a fishing expedition in the hopes that it

would lead to a confession or other useful evidence." *Reed*, 349 F.3d at 465.

Below, the district court found that what began as purposeful conduct morphed into conduct consistent with attenuation by the time of the Chicago Apartment. The agents violated the curtilage of the Geneva Home "to advance their investigation." *Conrad*, 578 F. Supp. 2d at 1036. But the agents were "professional" inside the Chicago Apartment and did not enter it as part of a "fishing expedition." *Id.* at 1037-38. Given those findings, the district found that while the third factor helped justify exclusion of the evidence obtained in the Geneva Home and in the car ride to the Chicago Apartment, the findings would not help justify excluding evidence obtained in the Chicago Apartment. *Id.*

We agree that this third factor very slightly tips in favor of attenuation. Importantly, the agents gave Mr. Conrad *Miranda* warnings while they were in the Chicago Apartment, even though those warnings were not legally required, and advised him in writing of his right to refuse to permit them to search his property. While certainly not a complete salve for the initial violation of the curtilage—hence the exclusion of the other, important evidence—the entirety of their conduct in the Chicago Apartment shows that their earlier constitutional blunder reflected only a temporary lapse in judgment, which had been cured by the time they entered the Chicago Apartment. Scrupulous though belated adherence to constitutional standards is not irrelevant in the fact-intensive inquiry

into attenuation, which ultimately seeks to regulate law-enforcement behavior, *Calandra*, 414 U.S. at 348. We thus agree with our dissenting colleague, *infra* at 28, about one "takeaway for law enforcement," from our finding that this factor slightly tips in favor of attenuation: "if you think you may have gone beyond what the Fourth Amendment allows," by all means go out of your way to avoid even the slightest hint of constitutional impropriety going forward. Doing so may not ultimately avoid suppression, but it might help.

### 4. *The Final Balance*

As indicated above, because of the somewhat unusual facts in this case, all three relevant factors tip in favor of attenuation regarding the Chicago Apartment, though none overwhelmingly so. We do not, therefore, need to balance them before concluding that the district court correctly identified the point at which evidence became purged of the taint from the curtilage violation: once the agents and Mr. Conrad entered the Chicago Apartment. The constitutional protection of the Geneva Home's curtilage was adequately vindicated here by excluding the evidence obtained there, including on the car ride away. Any marginal deterrence obtained by suppressing the evidence that Mr. Conrad was readily willing to "volunteer" at his Chicago Apartment, *Conrad*, 578 F. Supp. 2d at 1037, despite time to think first and a counsel from his father, would have been excessive and thus improper. *See United States v. Leon*, 468 U.S. 897, 910 (1984) ("[I]t does not follow from the emphasis on the

exclusionary rule's deterrent value that anything which deters illegal searches is thereby commanded by the Fourth Amendment." (citation omitted)).

## B.  Sentencing in Accordance with *Demaree*

As for whether we should overturn our precedent in *Demaree* and hold that the district court should have considered the Sentencing Guidelines in effect at the time he committed his crimes rather than when he was actually sentenced, we can be brief. As we have stated previously, "[w]e have reaffirmed our decision in *Demaree* many times . . ., and we will not overrule it here." *United States v. Robertson*, 662 F.3d 871, 876 (7th Cir. 2011) (collecting cases).[4]

## III.

### Conclusion

The judgment of the district court is AFFIRMED.

---

[4] Furthermore, even if it were appropriate to reconsider that decision in some other case, it would not be this one. After computing the guideline sentence, the district court found the sentence excessive given the statutory factors that courts must consider when selecting the appropriate sentence, 18 U.S.C. § 3553(a). It chose, therefore, to impose a non-guideline sentence. Had the district court consulted the earlier Sentencing Guidelines, as Mr. Conrad urges, its application of the § 3553(a) factors would have likely resulted in a finding that the lower guideline sentence was inadequate and imposed the higher one that it selected here.

TINDER, *Circuit Judge*, dissenting in part. A Fourth Amendment violation made it possible for FBI agents to enter Conrad's father's home, wake Conrad from his drug-induced sleep, and question him. Conrad quickly confessed to possessing and distributing child pornography and gave the agents his laptop. The agents asked Conrad to travel with them to his Chicago apartment, where he had said he had other computers. Conrad agreed and, within about fifteen minutes of the FBI agents' entry into his father's home, he was on his way to Chicago with two agents. Conrad sat in the backseat of their vehicle but was not handcuffed or otherwise re-strained. During the hour-long ride from Geneva to Chicago he called his father, smoked a cigarette, and chatted with the agents, discussing, among other things, the type of file server programs he operated. After the ride, Conrad brought the agents into his Chicago apart-ment, showed one of the agents his DJ equipment, fed his cat and changed its litter, and two more FBI agents arrived. Conrad was Mirandized and signed consent-to-search forms. He again admitted to possession and distri-bution of child pornography and turned over more com-puter equipment. The district court found a Fourth Amendment violation sufficient to suppress all evi-dence from the Geneva home and from the car ride. But the district court did not suppress evidence from the Chicago apartment, concluding that the evidence gathered there was sufficiently attenuated from the agents' Fourth Amendment violation. The majority agrees with the district court that a line should be drawn between (A) the evidence gathered at the Geneva

home and in the agents' car and (B) the evidence col-
lected at the Chicago apartment. In the majority's view, the
taint of the Fourth Amendment violation dissipated
even while defendant was in continuous contact and
conversation with the very agents responsible for the
Fourth Amendment violation. Because the majority's
position is inconsistent with precedent and dramatically
lowers the standard for attenuation, I respectfully dissent.

It has long been recognized that evidence obtained
by "exploitation" of a Fourth Amendment violation
should be suppressed. *Brown v. Illinois*, 422 U.S. 590,
600 (1975). It is often difficult to tell what amounts
to exploitation requiring suppression. *Bad faith* use of a
Fourth Amendment violation to acquire additional evi-
dence is sufficient to require suppression (but not neces-
sary), *see, e.g., United States v. Carter*, 573 F.3d 418, 425-
26 (7th Cir. 2009), and a *but-for* causal connection between
a violation and subsequently discovered evidence is
necessary (but not sufficient), *id.* at 424 (citing *Hudson v.
Michigan*, 547 U.S. 586, 591 (2006)). Many cases, like this
one, fall into the large middle-category where there isn't
clear evidence of bad faith but there is plain but-for
connection. The framework laid out in *Brown*, 422 U.S. at
603-04, is supposed to help us sort these middle cases. As
the majority correctly noted, we are to consider (1) "tem-
poral proximity," (2) "the presence of intervening cir-
cumstances," and (3) "the purpose and flagrancy of the
official misconduct." *Id.*

The first factor is least important. The majority's cases,
*supra* at 10, explain that, depending on *other* factors, a few

minutes may be sufficient for attenuation and many hours may be insufficient. By itself, then, a two-hour lapse between the original violation and the subsequently discovered evidence—not a particularly long or short time—tells us almost nothing. The majority nevertheless concludes that two hours tips in favor of attenuation. It can reach that conclusion, however, only by collapsing the first and second considerations, analyzing under the first heading not just the time elapsed—"temporal proximity," as *Brown* put it—but also the *quality* of that time. The quality of intervening hours or minutes is significant, of course, but it is properly analyzed as part of the intervening circumstances or, perhaps, as it relates to the purpose and flagrancy of the violation. In this case, analyzing temporal proximity on its own gets us nowhere; it doesn't support attenuation or suppression. *See United States v. Reed*, 349 F.3d 457, 464 (7th Cir. 2003).

Moving to the next factor, "intervening circumstances," the majority, endorsing the district court's analysis, identifies three facts favoring attenuation: (1) Conrad's consents to search and *Miranda* waiver, (2) the evidence that was not suppressed was obtained at a location different than the evidence that was suppressed, and (3) Conrad was allowed to call his father during the car ride with the agents. These facts carry some weight, to be sure, but, in my view, much less than the majority believes. First, consent and *Miranda* waivers are important—particularly insofar as voluntariness is a threshold requirement for the admissibility of any confession, *supra* at 9 n. 3—but, how-

ever important, they cannot amount to *independent* intervening circumstances. *See, e.g., Taylor v. Alabama*, 457 U.S. 687, 690 (1982); *Reed*, 349 F.3d at 464. *United States v. Robles-Ortega*, 348 F.3d 679, 684 (7th Cir. 2003), is instructive. In *Robles-Ortega* we focused on whether a voluntary consent to search was an intervening circumstance for the purpose of attenuation. We noted that "[a]s with confessions given after *Miranda* warnings, . . . consent alone does not necessarily purge the taint of the illegal action." *Id.* We then rejected the government's attempt to construe *United States v. Liss*, 103 F.3d 617 (7th Cir. 1997), as holding "that a consent is an independent intervening event that breaks the causal chain stemming from the illegal search." *Id.* The inquiry in *Liss* and *Robles-Ortega* had to do with *what else* happened; those cases concerned whether consent was obtained by means "sufficiently distinguishable" from Fourth Amendment violations to have been purged of the primary taint. *Id.* at 683. When *other circumstances* surrounding a voluntary consent to search or voluntary confession indicate that a prior illegality was not critical to obtaining the confession or consent to search, then *Miranda* warnings and voluntariness of consent will be decisive. But where, as here, the Fourth Amendment violation resulted in a voluntary confession and a voluntary surrender of incriminating evidence that the district court saw fit to suppress, attenuation should require more than just *another* voluntary confession and voluntary consent. The illegality must cease to be a path-breaking event that makes subsequent discoveries all but inevitable. In this case, we have a confession and consent given to an agent and, after about an hour in

the presence of that same agent, another confession and consent given to the same agent (and others). As the Supreme Court concluded in a different legal context, "[i]t would have been reasonable to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before." *Missouri v. Seibert*, 542 U.S. 600, 616-17 (2004). Without additional intervening factors, avowals of voluntariness are a technical break that have little value for an individual caught-up in successive (even non-custodial) interrogations on the same subject with the same agents.

But the majority thinks that there were additional intervening circumstances. The consents and waivers occurred in different locations—at the Geneva house and at the Chicago apartment. Yet the change in scenery cannot count for much here, where the most salient feature in Conrad's environment was the continuous presence of FBI agents. Consider *United States v. Fazio*, 914 F.2d 950 (7th Cir. 1990), a two-location case similar to this one but with at least one major difference: In *Fazio*, after a Fourth Amendment violation at his restaurant, defendant *drove himself* to a meeting where he made incriminating statements. *Id.* at 952. We emphasized this fact in deciding that the initial illegal search was sufficiently attenuated. *Id.* at 958; *Reed*, 349 F.3d at 464 (citing *Fazio* as an example of a case with sufficient intervening circumstances and specifically noting that defendant drove his own vehicle to the meeting where he made incriminating statements). If the agents would have asked Conrad to drive his own

car (he had a Porsche parked in the driveway of the Geneva home) to the Chicago apartment, this would be a very different case. Given some time away from the agents, Conrad may or may not have decided to go to the Chicago apartment and confess. He may have taken more time to talk to his father (and it would have been a more private conversation without agents listening to Conrad's side of the call), he may have made other calls—we can't know. Whatever he might have done, if he did show up at his Chicago apartment an hour or two later to consent to a search and confess his crimes, the search and the confession would have retained a but-for connection to the initial Fourth Amendment violation, but it would have separated the two events enough to make the second (if it still occurred) an independent act, freely undertaken and not one made virtually inevitable given what he'd already shared with the agents. *See Fazio*, 914 F.3d at 958. But the agents did not take the chance that Conrad wouldn't show up or would think better of continuing to talk to them. They kept him in their presence, in the backseat of their car, kept him talking, and kept him comfortable—they kept him on the line and then continued reeling him in.

Finally on this second factor, the majority lists Conrad's phone call to his father while riding in the backseat of the agents' car as a significant intervening circumstance. This fact recalls *Taylor*, 457 U.S. at 691, where a defendant was given the chance to speak privately for five to ten minutes with his girlfriend and a male companion before making his confession. That much longer

(and more private) conversation, even paired with re-peated *Miranda* warnings, wasn't enough to "purge the primary taint." *Id.* In this case, the short call Conrad made *from the agents' car*, *in the agents' presence*, did little to interrupt the seamless interaction between Conrad and the agents. Moreover, it's hard to understand how the call could have much value as an intervening circum-stance when it was part of the evidence suppressed in the wake of the initial Fourth Amendment violation.

This brings us to the third factor, "purpose and fla-grancy." The majority carefully and accurately recites the law, observing that our cases consider "both the conduct before and after the constitutional violation." *Supra* at 15. The majority also points out that "actions . . . undertaken in an effort to advance the investigation" cut against attenuation. *Supra* at 15 (quoting *Reed*, 349 F.3d at 465). Agreeing with the district court, the majority concludes, however, that "what began as purposeful conduct morphed into conduct consistent with attenuation by the time of the Chicago Apartment." *Supra* at 16. To support this result, the majority refers to the agents' "professional" behavior at the Chicago apartment, that Conrad was advised of his *Miranda* rights, and that he was told in writing of his right not to allow the agents' search. I have already said why I believe that "reliance on the giving of *Miranda* warnings is misplaced." *Taylor*, 457 U.S. at 691. And the same goes for reliance on defen-dant's consent to search. *Robles-Ortega*, 348 F.3d at 684. The bottom line for the district court and the majority, then, incorporating their emphasis on *Miranda* warnings

and consent, is that the agents' professional behavior and the strangely cordial atmosphere were sufficient to dissipate the taint of the Fourth Amendment violation. I disagree. As we explained in *Reed*, there is no attenuation by friendliness:

> In determining the purpose and flagrancy of the official misconduct, the district court held that the factor weighed against suppression because [defendant's] interrogation was conducted congenially and the police judiciously administered *Miranda* warnings, suggesting that the manner of the illegal arrest and subsequent interrogation was not "calculated to cause surprise, fright, or confusion." *E.g., Brown*, 422 U.S. at 605. But that inquiry, although relevant, is not complete, because "purposeful and flagrant" misconduct is not limited to situations where the police act in an outright threatening or coercive manner . . . .

349 F.3d at 465. In this case, the agents only came into contact with Conrad because of their Fourth Amendment violation. That got them in the house and got them their first interview with Conrad. It turned out to be a very advantageous time, at least from the agents' perspective, for the interview to occur because moments before it began, it appears that Conrad was in the depths of a drug-aided sleep. Once roused by the agents, Conrad promptly confessed to a very serious crime and gave them, in addition to his statement, incriminating physical evidence. Having learned about the Chicago apartment, the agents asked Conrad to travel there with

them to continue his cooperation. By the time they got to Chicago, an hour later, the taint (according to the majority) had dissipated. The only pause in the continuous conversation with the FBI agents was Conrad's short call to his dad. Did that do it? Or was it the length of the drive itself? Would the situation have "morphed" into conduct consistent with attenuation if the house and apartment had been just twenty minutes apart? Was it the extra time for friendly banter about stereo equipment that made the difference?

In my view, nothing of significance separated the Fourth Amendment violation, the collection of evidence that was suppressed from the Geneva house through the drive to Chicago, and the collection of additional evidence at the Chicago apartment. It was a single continuum of events. Yet the majority holds that the taint of a Fourth Amendment violation can dissipate even while a defendant is in *continuous contact and conversation* with the very agents responsible for the Fourth Amendment violation. I realize that letting Conrad off the hook after the Fourth Amendment violation—like arranging to meet him later—would have jeopardized the agents' nearly certain collection of the incriminating evidence they set out to get when they went to the Geneva house. But it is difficult to see any consequential separation between what happened at that house and the completion of that process at the Chicago apartment. Of course, the agents treated Conrad well enough; they chatted him up; there was no need to be aggressive, they were smarter than that. But at no point did they

disengage, and at no point did they provide Conrad a real break in the continuous interaction that started with a confession in Geneva and ended with another in Chicago. It would seem that after this case not much is required for attenuation. The takeaway for law enforcement is that if you think you may have gone beyond what the Fourth Amendment allows, not to worry, just don't let the suspect out of your sight, be congenial, and all will be forgiven. Because I think that allowing attenuation to mysteriously arise during a nonstop interaction with a single group of agents is inconsistent with precedent and gives far too much weight to the role of *Miranda* warnings and consent, and because I think the agents improperly exploited a Fourth Amendment violation to investigate Conrad's crimes and to gather evidence, on this issue I respectfully dissent.